this morning, Cylinda Scott v. University of Chicago Medical Center, and other defendants. I think we've got three defense counsel up this morning. Mr. Dvorak. Your Honors and counsel, and may it please the court. In this case, we have, I represent three families. I represent the Bowers, the Kosicks, and the Scotts. And these three families made an informed medical choice on behalf of their babies. These were decisions made ahead of time, based on information that they gathered, their medical reasons, their religious reasons. And in the case of the Scotts, it was because there was one prior child who had a bad reaction to vitamin K. So normally... To the erythromycin or the vitamin K? To the vitamin K, I believe. Although there's a different client who had a prior reaction to the erythromycin. So either way, I mean, these are, if you look at the FDA black box warning, there is a risk to having a vitamin K shot. And obviously there's a risk in refusing the vitamin K shot. But these are classic medical choices that parents make. It's as long of a tradition under substance abuse process as exists. It's literally the most cherished right that we have in this country. Now, DCFS, at the urging of medical defendants, many medical defendants, but including these defendants or these hospitals at least, usurped this role of the parent. And again, under substance abuse process, the parents are presumed to act in the best interest of the child. Instead, DCFS wanted not a law, not something that would go through the legislature, but they wanted DCFS to take their Procedures 300, Section 8H, which was only an internal policy. Looking at the 1983 section, in 1983, what evidence do we have that would characterize any of these defendants as state actors? Well, jumping ahead, Your Honor, to that basic question. So I think first of all, we have to look at the liberal pleading standard. So plausibility is the only standard that we have to meet. Second of all, I think we have to look at the case law on color of law. Because in particular, the color of law analysis requires an extremely fact-intensive analysis. It requires a functional analysis. And the plain language of Section 1983 also supports our position, because it says, any person, any person, as the Supreme Court has said, literally anyone can be a state actor if they act under color of law. However, the case law provides for these groupings that we've got to look to. And in some of these, for example, the conspiracy one, that conspiracy, for that conspiracy requirement to be satisfied, there would have to be some type of an agreement between the actors. Here, I think it's the case that the Section H had already been changed by the time before you're saying that the agreement took place. Can you address that? Yes, yes, Your Honor. So Section 8 was in existence only as an internal policy within DCFS. And what was happening is that DCFS was not agreeing to get the backs of the hospitals, so to speak, and investigate these parents for per se refusals. This is not based on any neglect issues or anything wrong with these particular babies. They wanted a per se policy that every single baby in Illinois, every healthy baby, must receive this shot, no matter if the parents agree or not. They wanted to keep it secret. They wanted to make it only among the hospitals. And they wanted to make sure that the parents had no choice. Once a woman is pregnant, getting ready to have the baby, there is, in reality, no choice. I mean, you are going to do what the doctors say. The only relief would be if you call the police, which actually happened twice in this case. It's a pretty extraordinary thing that happened in this case, that there were two parents who had to go to the resort of actually calling the Chicago police to prevent the hospitals from infringing on their constitutional rights. And the policy arguments, obviously, resulted in this vacillation in whether or not it applies. But Judge Pryor's question goes to the state action component. Correct. Correct. And ultimately, remember, there's been various tests throughout the history of the court and the Seventh Circuit. But the latest pronouncement that really addressed this was Rodriguez. And in Rodriguez, it was very clear that even though this court said there are these four tests, it didn't apply any of them. Should it only be applied to the prisoner context, Rodriguez? No, I think it can be applied outside the prisoner context. It never said that it was applied outside the prisoner context. Other lower district courts have interpreted it. I mean, they're split on the issue, but there are courts that have interpreted otherwise. And there's nothing about the legislative background of Section 1983 or the plain language that says this Rodriguez, call it a test, whatever, only applies to prisoners. I think ultimately, see, what I think the defendants did and the lower court did was they jumped right to the test. When really, the number one thing that this court has to do is answer the ultimate question of whether the conduct, conduct, not the status, the conduct of the person acting under that state statute, regulation, guideline, et cetera, can be fairly attributable to the state. And they ignored that basic question. If a doctor was to not have the DCFS to get their back, so to speak, it would literally be kidnapping. I mean, there is no way a doctor can just decide to give. What's the limiting principle on your theory of state action here? If accepted, it would turn every mandatory reporter in a child abuse or neglect situation into a state actor, if taken to its logical conclusion. I don't see any limiting principle on your theory of state action. Chief Judge Sykes, there is a limiting principle because we're not trying to say that color of law is based on reporting neglect. What we're trying to say is that these particular hospitals, medical defendants, et cetera, purposefully worked with DCFS officials, who, by the way, consulted legal and told them this is illegal, and they did it anyway. They purposefully came up with this Section H policy, not a state law or regulation, to cover their actions, to make the choices the doctor wanted. Not in this particular case or these particular cases. There was involvement by some U of C pediatricians in lobbying for Section H and to consider a vitamin K or erythromycin refusal as an instantiation of medical neglect reportable to the child welfare agency, state child welfare agency. But that background lobbying activity had nothing to do with these particular cases. You've got to provide some link to the folks that actually reported, the private medical providers that actually did the reporting in your clients' cases to make them and the two private hospitals state actors here. Well, Your Honor, I do think there is a link, especially with University of Chicago, because these were Drs. Glick and Drs. Jardis, and they had these dual roles as a DCFS advisor and as a DCFS medical director, also advocating for this policy that they were told is illegal so that University of Chicago itself, this is where Monell comes in, where the University of Chicago can have this policy. So that is Part 1, by the way, of the color of law. The Part 2 would be... Would immunity not cover those actions? No, because, Your Honor, this court has already ruled that private actors are not allowed to invoke qualified immunity, and the defense never raised a good-faith argument in the courts at all, and it wouldn't apply anyway, given the facts of this case. Part 2 of this, whether it's connected to the earlier implementation, and again, I wouldn't call it lobbying, because if you want to lobby something, you go to the legislature. You pass a law. No, this is a regulatory issue, so you lobby the regulators, not the legislature, and that's what was going on in the background, but there's no link between that and what happened in your client's cases. But, Your Honor, regulators must actually follow regulation law. The legislators had no idea this was going on. This was an internal policy, not a public regulation. That may be an issue insofar as it related to your claims against the actual state actors here, the regulators, but it's not a claim here. These are private medical providers. I'll move on to the second part, Your Honor. The second part of all of this is there's a state statute that says that you can, if there is actual basis for taking a child, doctors, DCFS lawyers, I'm sorry, DCFS caseworkers, police officers, and doctors under this statute are the only three individuals who can seize children pursuant to this state statute. This is the person acting under color of law, that law, and if you look at those three actors, we have a very traditional state actor, DCFS caseworker. We have a very traditional state actor, which is a police officer, and in this case, the doctors are grouped within that same category, and so they have the same power as those state actors. They have the full powers of those other ones. And Illinois case law traditionally says that taking a child into custody is something that is the prerogative of the state. So I do think it satisfies a lot of those tests based on that. I also want to address, actually I'm going to save my time because I've got three opponents. That's fine. Thank you. Mr. Kimberly. Thank you, Chief Judge Sykes. May it please the court, my name is Michael Kimberly. I represent the University of Chicago Medical Center and Dr. Stephanie Liu, who are the defendants in the first case, number 22-2096. Your Honors, this case I think can be resolved by affirming the district court on the grounds on which it itself ruled. Dr. Stephanie Liu is a private person who works at a private hospital. She was not acting under a color of law in any of her interactions with the Scots shortly after the birth of their child, Baby A. She accordingly can't be liable for constitutional torts under Section 1983. Now the plaintiffs have offered four overlapping theories for suggesting that, in fact, Dr. Liu's conduct is attributable to the state, and therefore she is a state actor subject to Section 1983. Those are conspiracy, exclusive public function, entwinement, and a sort of general state control analysis under the Rodriguez case. A lot of the attention has been focused on conspiracy, so I'll start there. Conspiracy requires two things in the 1983 sense. First, it requires an agreement, and that agreement has to be between the private defendant and the state officials to deprive the plaintiff of a constitutional right. Then the second element is there's got to be willful participation in joint activity towards achieving the objective of that agreement, and neither of those things is present on the facts alleged as against the Scots. The allegations against Dr. Liu in particular are summarized at pages 21-22 of the opening brief. She's alleged to have, quote, harassed the Scots for their refusal for a vitamin K shot for baby A. Second, she's alleged to have threatened to take baby A into protective custody to administer the shot against the Scots' preferences. And third, she's alleged to have reported the Scots to DCFS for refusing the vitamin K shot. This is the first that I'm hearing that this third theory that Dr. Liu made the reporting is not a basis for liability here, so I'm just going to set that aside. I think my friend on the other side just waived it. As for the first two theories, there are no allegations here that Dr. Liu worked together with a state official in any way. There's no allegation that state officials were a part of an effort to harass the Scots, nor is there any allegation that they were involved in anything concerning a threat to take temporary protective custody. Section H, first of all, was not in effect at the time that baby A was born. In addition, Section H actually says nothing about protective custody. It says only that reports of vitamin K refusals will be taken as reports of medical neglect, consistent with DCFS regulations. So taking all the allegations on their face, there is no involvement of the state here with respect to the birth of baby A. In fact, the opposite is true because, as my friend on the other side noted, it's alleged that the police were called to stop UCMC staff from administering the shot. And so police officers are state actors, and here the state actors are telling UCMC staff to stop. That's the opposite of a conspiracy. That is not a meeting of the minds. No, we do, Mr. Kimblee, with the suggestion that Dr. Glick, I believe Dr. Jaundice, played a significant role in having Section H re-implemented. Well, I'd point the court to attached appendix pages 25 to 26 and 67. Dr. Glick was a defendant in the other case that's been consolidated here. As to that case, we defended her actions as protected by the First Amendment under the Norr-Pennington Doctrine. The district court agreed. All that she was doing was lobbying state officials in favor of a policy that she thought was important and was consistent with her own approach and medical judgment. The district court agreed and dismissed Dr. Glick on the basis of the First Amendment and the Norr-Pennington Doctrine. That holding has not been appealed, so it's law of the case. It's not in this appeal only because it hasn't been appealed, but it certainly continues to be a basis on which it would be inappropriate, I think, to hold any of the private defendants liable on the basis of Dr. Glick's conduct. Norr, I would add, is there are allegations now against UCMC itself on sort of a Monell theory for having adopted its own policy, but the fact that a private institution adopts a policy that is modeled on a policy adopted by a state authority does not turn that private institution into a state actor. My friends on the other side have not pointed to any authority to suggest otherwise, and I think, indeed, Lugar makes the Supreme Court's decision, and Lugar makes a contrary decision impossible. There the court said that a private actor doesn't transform into a state actor merely because, quote, it's seeking to rely on some state rule governing its interactions with others. Now the Scots have alternatively alleged both in the presentation here and at page 12 of the reply brief that UCMC required Section H to give it cover, but one, that doesn't, again, support a conspiracy theory because it's not coercion. Cover is not coercion. But beyond that, it just isn't true. Illinois statutory law specifies that vitamin K must be administered. Excuse me. Illinois administrative law specifies that vitamin K shots must be administered within the first 48 hours after birth. That's Section 250, 1830G8. Mr. Kimley, do we gain any traction under the public function test? I don't think so, Your Honor, because my friends on the other side, I don't think, have identified any exclusive public function that would qualify under the Supreme Court's cases in this respect. I think, as I understand it from the reply brief, their latest theory is that taking temporary protective custody of children to prevent medical neglect is a public function. If it is a public function within the meaning of the court's cases, it obviously is not an exclusive public function because it's one that private doctors are authorized by law to undertake themselves, as are, I might add, family members and other private actors. So it doesn't satisfy the exclusivity requirement, nor does it satisfy the sort of general requirement that the function be ongoing. You know, the sorts of cases where public function had been satisfied is where private entities are running towns or establishing and running entire public parks, and that just isn't the kind of function that we have at issue here. I see my time has expired. Are there no further questions? Thank you. Ms. Hines. May it please the Court. Erin Bowen Hines on behalf of Applease, the Silver Cross Hospital and Medical Centers, and Monica Kozuch, who is a registered nurse and an employee of Silver Cross Hospital. The appellants have brought claims under Section 1983 against the Silver Cross Applease, which I'll refer to as both parties I'm representing, for violations of their substantive due process under the 14th Amendment and against Nurse Kozuch for a Fourth Amendment violation for her alleged illegal taking of their newborn to the nursery when they refused a vitamin K shot and neuromycin eye ointment for their newborn. To state a claim under 1983, we need a dual showing of an infringement of constitutional right and that the party charged was acting under color of state law. The Silver Cross Applease are private actors and qualify as state actors under very limited circumstances. The appellants advanced a single cognizable theory under which the Silver Cross Applease acted under color of state law, and that is joint action. To plausibly state a joint action claim, a plaintiff must show that an official and a private individual reached an understanding to deprive the plaintiff of their constitutional right and that the individual was a willful participant in the joint activity with the state. Now, the correct pleading standard for this in this circuit requires allegations of meeting of the minds. It's not sufficient to allege that the private actors and the state actors acted in concert or with a common goal, and that's the Tarkovsky case, and nor are conclusory legal statements sufficient to support the meeting of the minds, and that is the Spiegel case. The question here is whether appellants plausibly alleged more than conclusory legal allegations that there was a conspiracy between Silver Cross and DCFS to create a policy based on Section H in order to deprive the constitutional rights of the appellants for their refusal to accept a vitamin K shot and your rhythmizing eye ointment for the newborns. The appellants have failed to do so. The allegations to support this conspiracy boil down to a very lengthy complaint, to the allegation that in October 2019, DCFS sent an email to the Perinatal Advisory Committee of the Illinois Department of Health, the leadership, stating, we are asking hospitals to report the refusal of medical neglect. Appellants then allege upon information and belief, this email was circulated to Illinois hospitals. Based on these allegations, appellants jump to the conclusion that Silver Cross reached an agreement with DCFS to create a policy to deprive the appellants of their constitutional rights. These allegations are insufficient under the pleading standards in this circuit to state a claim for state action on behalf of the Silver Cross appellees. They've also asserted a claim for respondeat superior liability to Silver Cross for the constitutional violations of its employees. And in this circuit, private corporations are not liable for those violations, and that's under Iskander and the Shields case. And because under a Monell theory, it requires- Should the court take the opportunity to reconsider Iskander? No. First of all, appellants did not articulate why they should. And in addition to that, the concern that was raised in Shields was specific to the growing privatization of third-party medical contracting for inmates. And it's an issue that is completely distinct from this case, and it doesn't raise an issue to reconsider that holding. Wouldn't we also need a predicate basis for finding one of the employees liable as a state actor? Yes. Before we would get to any possible reconsideration of Iskander. That's correct, and we haven't even gotten to that because we haven't gotten over the first step. None of your hospital clients' employees lobbied the regulators to change Section H? There's no allegation of that. Thank you. Thank you. Mr. Comer. Good morning. May it please the court. Joseph Comer on behalf of Appellee Dr. Miroslav Skalski. You've, of course, already heard from two of my colleagues, so I'll try and focus the issues on Dr. Skalski. And the issue with him is really whether a private physician who allegedly criticized a couple's beliefs regarding the medical treatment of their newborn child can be liable under Section 1983. And the answer clearly is that he cannot. I'll focus first on the personal involvement requirement under the color of law analysis. Dr. Skalski is not alleged to have had any personal involvement in any of the alleged deprivations. He did not speak to anyone from DCFS. He did not speak to anyone who is alleged to have removed the baby from the room and, in fact, was not involved with the child's case until an hour after that had occurred. The appellant's reply brief states for the first time that he worked with DCFS to initiate the removal. That's simply not alleged in the complaint. Instead, quite the opposite is alleged, that in his communications with the parents, they requested to go see the baby and nurse the baby in the nursery and that he agreed and did not prevent them from doing so. If the claim is based merely on Dr. Skalski's statements and criticisms of their refusal of the vitamin K and erythromycin, that is not an actual claim under 1983. An attempted infringement of a right is not a constitutional violation. As we cite in Andre and Goldschmidt, the principle is that there must be an actual violation. And simply threatening, as appellants claim that this was coercive, threatening seizure even, would not rise to the level of a constitutional violation or threatening to give unwanted medical treatment. The medical treatment was never given in this case. So there was no violation of the parent's right to determine their child's medical treatment. With respect to the seizure, there's simply no facts regarding Dr. Skalski's involvement in that. Again, he wasn't involved until an hour after that occurred. And in fact, he facilitated them reuniting with the baby. With respect to the specific conspiracy claim that falls under the color of law analysis, there's simply no meeting of the minds between Dr. Skalski and any government actor. And there couldn't be because he never even communicated with one. This court's jurisprudence makes clear there needs to be a literal meeting of the minds. These ambient allegations that DCFS was concerned about the rise in the refusal of vitamin K and it was initiated in internal policies, and that some hospitals and unidentified pediatricians were also concerned about that rising refusal and implementing their own policies, is not sufficient to show a mutual agreement between the two sides. And certainly not sufficient to show a mutual agreement with Dr. Skalski, who is not alleged to have lobbied for any change within DCFS, not alleged to have created any policy at the hospital, or have communicated with any DCFS actor. Even if Dr. Skalski implicitly had some involvement in any of those things, that still would not be enough. As this court has noted, it has no qualm with the principle that reporting something to DCFS or communicating with them does not create a conspiracy among the parties. As my co-defense counsel noted in Tarkowski, acting with a common purpose is not sufficient to create liability for conspiracy theory under Section 1983. And so both prongs of the state law analysis fail for Dr. Skalski, and the district court's dismissal of him should be affirmed. Thank you. Thank you. Mr. Dvorak. Your Honors, I'd like to address the issue of whether or not this hospital licensing regulation required the giving of vitamin K over the express wishes of the parents. I think clearly that is not the case, because, I mean, just as if, you know, there's ethical regulations for lawyers that say you have to act in the best interest of your client. But that doesn't mean that I can, you know, tell my client to go to trial when he wants to plead guilty. I mean, these are just regulations that obviously are not going to supersede the parents' express wishes. And the reason that's important also is because there really was no regulation that they were following under Lugar, because this hospital licensing regulation is not a regulation that would supersede the express wishes of the parents. And as far as Section H itself, once again, it was not subject to any sort of public scrutiny whatsoever, and DCFS knew it was illegal and told the defendants that it was illegal. This was merely an internal policy. Now, we talk about the meeting of the minds, because that has come up many times. The meeting of the minds is that, remember, this DCFS policy existed in 2015, but it wasn't good enough for the doctors and the hospitals. They needed their cover to do what they wanted. So the agreement is to take that policy to the hospitals to allow them to, and the email made that explicit, you should now consider every single refusal to be medical neglect. So the policy was needed for that, and then you have the hospitals creating their own policy to mirror that. Going back to Chief Sykes' question, how did it exchange from lobbying for a position to that of acting under the color of state law? Because the only way to justify the taking of children for absolutely no reason whatsoever and forcibly giving them medication is if they have the official stamp of approval from DCFS. They explicitly said that in the meetings, that that's why we need this. There was a question of one of the doctors who we believe is a U of C doctor. Will we get sued for this? The answer was no, because we have DCFS who's going to cover for us. That's exactly the sort of thing that does state a conspiracy. You can call it a hub and a spoke, but the goal was to make parents comply against their wishes with what the doctors want, what the hospitals want. And the people in the hospitals themselves made the policy, and the doctors and nurses carried it out. If you're talking about conspiracies, we've got an organization, and we've got foot soldiers. That's what they are. They're implementing and carrying out a policy that every single person knew was illegal and unconstitutional. And they couldn't have done it if it wasn't for acting under color of law with DCFS to get their approval. Mr. Dvorak, what percentage or portion of this entire litigation has been settled or dismissed? Well, anything against DCFS has been settled, except we do have two pending cases in the lower court. It does say acting agents and employees, which obviously makes doctors Glick and Jadis. Well, we didn't sue Dr. Jadis because she died because of litigation, and there was reasons why we didn't. But Dr. Glick, to the extent that she was working as a DCFS employee, that would have been settled. So what we have here is her working on behalf of the hospital, because clearly she was working on behalf of the hospital. And the hospital itself then implemented its own policy. Finally, I should also – my time is up. Thank you. Thank you very much. Our thanks to all counsel. The case is taken under advisement.